AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the

### Southern District of California

FILED

MAY 1 6 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                        DEPUTY

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. |
| Silver Apple iPhone in a clear case Associated phone number: (619) 453-2186 Pass code: 0712 | ) ) ) | 19 MJ 2056 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Distribution of Fentanyl Resulting in Death |

The application is based on these facts:

See attached affidavit of DEA Special Agent Sarah Duray

☑ Continued on the attached sheet.

❑ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Sarah Duray, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/16/19

_____
*Judge's signature*

City and state: San Diego, California

Hon. Michael S. Berg, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Special Agent Sarah Duray, being duly sworn, hereby state as follows:

**INTRODUCTION**

1.     This affidavit supports an application for a warrant to search the following:

   a.     A silver Apple iPhone in a clear case with an associated phone number of 619-453-2186 and a pass code of "0712" (**Target Device 1**);

   b.     A True Slim cellular telephone (IMEI #1:355180002415074) with an unknown associated phone number (**Target Device 2**);

   c.     A Ojji cellular telephone (Serial #20160905003593) with an unknown associated phone number (**Target Device 3**);

   d.     A Life Wireless cellular telephone (IMEI #353911084092445) with an unknown associated phone number (**Target Device 4**);

(collectively, the **Target Devices**) as described in Attachments A-1 through A-4, for evidence of violations of Title 21, United States Code, Section(s) 841 (b)(1)(C) – Distribution of Fentanyl Resulting in Death.

2.     Agents seized **Target Device 1** on October 25, 2018 from a vehicle driven by Travis Ray BALLOU which was parked next to a fast food restaurant located at 2140 East Plaza Boulevard, National City, California, 91950. Agents seized **Target Devices 2, 3** and **4** later on October 25, 2018, during a consent and Fourth Amendment wavier search of BALLOU's bedroom, located at 8384 El Paso Street, La Mesa, California 91942. The **Target Devices** were seized following BALLOU's arrest for violations of California Health and Safety (H&S) code § 11352(A) – transportation of a controlled substance, Penal Code (P.C.) §192(c) – Involuntary Manslaughter, P.C. § 29800(a) – Felon in Possession of a Firearm, and P.C. § 12022.7(a) – Enhancement for Great Bodily Injury Upon Another. The **Target Devices** are currently stored as evidence at the Drug Enforcement Administration (DEA) San Diego Field Division (SDFD) located at 4560 Viewridge Avenue, San Diego, California 92123.

1

3.     Based on the information below, there is probable cause to believe that a search of the **Target Devices** will produce evidence of the aforementioned crimes, as described in Attachments B-1 through B-4.

4.     The following is based upon my experience and training, investigation, and consultation with other law enforcement agents and officers experienced in narcotics violations, including the Target Offense. The evidence and information contained herein was developed from my review of documents and other evidence related to this case. Because I make this affidavit for the limited purpose of obtaining search warrants for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause. Dates and times are approximate, and refer to Pacific Standard Time unless otherwise specified.

## EXPERIENCE AND TRAINING

5.     I am a Special Agent Criminal Investigator for the United States Drug Enforcement Administration (DEA), and I am an investigative or law enforcement officer of the United States within the meaning of Section 210(7) of Title 18 of the United States Code. I am empowered by law to conduct investigations and to make arrests for felony offenses. I was hired by the DEA in May of 2018, and I attended the DEA academy for approximately eighteen (18) weeks. At the DEA Academy, I was trained in the various aspects of conducting narcotics investigations. In September 2018, I was sworn as a DEA Special Agent (SA) and was assigned to DEA San Diego Field Division (SDFD).

6.     While with the DEA, I have participated in approximately 100 narcotics investigations and more than 50 arrests for violations of the California Health & Safety (H&S) Code. These investigations and arrests involved: (1) unlawful importation, exportation, manufacture, possession with intent to distribute and distribution of narcotics; (2) the laundering of narcotics proceeds and monetary instruments derived from narcotics activities; and (3) conspiracies associated with narcotics offenses. These

investigations have involved debriefing defendants, witnesses and informants, conducting surveillance, assisting in court ordered interceptions, executing search warrants, seizing narcotics and narcotics-related assets and making arrests for narcotics-related offenses.

7.      I am currently assigned to the DEA San Diego Field Division's (SDFD) San Diego County Integrated Narcotics Task Force (NTF) Team 10 and have been since September 2018. NTF Team 10 is comprised of DEA SAs, Task Force Agents (TFAs) and Task Force Officers (TFOs) from the San Diego Police Department (SDPD), Department of Homeland Security Investigations (HSI), Federal Bureau of Investigation (FBI) and Department of Health Care Services (DHCS). NTF Team 10 primarily investigates illegal drug trafficking organizations (DTOs) operating in the United States and internationally, including those DTOs whose operations involve the distribution of wholesale quantities of fentanyl, oxycodone, hydrocodone, other controlled pharmaceutical drugs, cocaine, methamphetamine, marijuana, heroin and hashish in and around the San Diego, California area. Team 10 focuses on investigating illegal drug distribution related to drug overdose deaths in San Diego County.

8.      Prior to being employed with the DEA, I was a Police Officer for the SDPD from September of 2016 to May of 2018. I completed a 25 week California Peace Officer Standards and Training (POST) P.C. 832 arrest course and have received certification completion from POST. I was assigned to patrol in Mid-City Division where I was responsible for responding to 911 radio calls as well as investigating and assisting with the investigations of over 100 crimes occurring in the city of San Diego.

9.      Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics distributors to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities

of hard narcotics, such as cocaine, heroin, and methamphetamine. Typically, narcotics dealers are in telephonic communication with both their suppliers and customers.

10. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling/trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

a. Drug dealers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b. Drug dealers will use cellular/mobile telephones to negotiate the price, type, and quantity of drugs being sold to customers, and received from suppliers.

c. Drug dealers and their accomplices will use cellular/mobile telephones to arrange times and places to meet with customers to deliver illegal drugs, and to arrange times and places to meet with suppliers to receive illegal drugs.

e. Drug dealers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as ongoing enforcement operations in their area.

f. Drug dealers and their co-conspirators often use cellular/mobile telephones to record money owed to customers and suppliers and as evidence of past orders received and/or delivered.

g. The use of cellular/mobile telephones by drug dealers tends to generate evidence that is stored on the cellular/mobile telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

11. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular/mobile telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a drug dealer's use of a cellular/mobile telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

12.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics distribution investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned, based upon my training, education, and experience that searches of cellular/mobile telephones associated with narcotics smuggling/trafficking investigations yield evidence:

a.     tending to identify attempts to possess heroin, Fentanyl, or other federally controlled substances with the intent to distribute them;

b.     tending to identify other accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the possession of heroin, Fentanyl, or other federally controlled substances with the intent to distribute them within the United States;

c.     tending to identify co-conspirators, criminal associates, or others involved in the possession of heroin, Fentanyl, or other federally controlled substances with the intent to distribute them;

d.     tending to identify travel to or presence at locations involved in the possession or distribution of heroin, Fentanyl, or other federally controlled substances, including stash houses, residences used to prepare or process controlled substances, and/or delivery points;

e.     tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

13.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics distribution investigations, and all the facts and opinions set forth in this affidavit, I have learned that those who distribute narcotics typically maintain in their residences certain tools used in their trade. These include tools used to process narcotics for sale, such as digital scales used to weigh out small quantities of narcotics, and equipment used to store, package, distribute, and/or consume narcotics. Narcotics dealers may also keep and maintain firearms to protect their narcotics and their proceeds. Narcotics dealers typically keep and maintain multiple cellular phones on their premises. Narcotics dealers are aware that law enforcement may monitor cellular communications and they keep multiple cellular phones on hand to thwart those efforts. I have learned that many of these items are frequently recovered from residences used and maintained by narcotics dealers.

**FACTS SUPPORTING PROBABLE CAUSE**

14.     On October 24, 2018, National City Police Department (NCPD) Officers were called to respond to a report of a deceased female, who was subsequently identified as Jackie Christine GALVAN, who appeared to have suffered a drug overdose.[1] GALVAN was found at her friend, AC's, residence located at 1938 East 17th Street, National City, California 91950.

15.     At approximately 7:03 p.m., NCPD Officers S. Anderson and J. Taylor responded to the aforementioned residence. After numerous attempts at resuscitation, paramedics on scene pronounced GALVAN deceased. GALVAN had a visible mark on her left arm that appeared to be the site of a recent injection. GALVAN's black iPhone was found on the chair where she had been sitting.

16.     Team 10 agents responded to the residence at approximately 8:30 p.m. and took custody of GALVAN's iPhone. Additionally, agents spoke with AC. AC stated

---

[1] On January 18, 2019, SA Duray received GALVAN's final report from the San Diego County Medical Examiner's office that concluded GALVAN's cause of death was acute fentanyl and heroin intoxication.

1  she knew of GALVAN's heroin usage and would often try to talk GALVAN out of
2  using. AC said she had communicated with GALVAN earlier in the day and learned
3  that GALVAN had overdosed the previous day (Tuesday, October 23, 2018), was taken
4  to the hospital, and was subsequently released. GALVAN told AC she had overdosed
5  from the pre-loaded syringes she obtained from her source of supply (SOS). AC stated
6  GALVAN arrived at her residence in the early afternoon. According to AC, GALVAN
7  asked if she could borrow twenty dollars to pay back a friend, and AC agreed. Shortly
8  thereafter, AC observed GALVAN walk out to a vehicle that had pulled up in front of
9  the residence and speak with the individual in that vehicle. AC stated GALVAN then
10 walked back to the front yard of the residence and sat down on a sofa chair while AC
11 made a phone call. A few minutes later, AC noticed that GALVAN appeared
12 unconscious and in an odd position on the sofa chair. AC attempted to wake GALVAN,
13 but was unsuccessful. AC then called 911.

14     17.    On October 25, 2018, San Diego Superior Court Judge Charles G. Rodgers
15 signed a California State search warrant (#58649), authorizing both the search of
16 GALVAN's iPhone cell phone and its use in a subsequent investigation of GALVAN's
17 death. Agents subsequently reviewed the contents of GALVAN's iPhone and then
18 utilized GALVAN's iPhone in an undercover manner, posing as GALVAN.

19     18.    While conducting a review of the text message communications in
20 GALVAN's iPhone, agents identified suspected drug-related text messages between
21 GALVAN and a contact listed only as "Mr Mans!" with an associated telephone number
22 619-453-2186. "Mr Mans!" was later identified as BALLOU, after BALLOU
23 personally appeared to deliver heroin to GALVAN. The text messages indicated
24 GALVAN had previously obtained suspected heroin from BALLOU on October 22, 23,
25 and 24, 2018. Text messages from October 24, 2018 indicated that, at approximately
26 4:14 p.m., just hours before GALVAN's death, BALLOU delivered heroin to
27 GALVAN at Chalmers' residence. Then, at 4:20 p.m., BALLOU told GALVAN to be
28 careful and that he meant to bring her Narcan but forgot. The next day, October 25,

1   2018, BALLOU texted GALVAN twice checking on her and stating he hoped she was
2   okay.

3       19.     On October 25, 2018, agents, acting in an undercover (UC) capacity as
4   authorized by the aforementioned search warrant, began using GALVAN's iPhone by
5   posing as GALVAN to coordinate the purchase of an additional quantity of heroin from
6   BALLOU. Ultimately, BALLOU agreed to meet agents (posing as GALVAN) at
7   approximately 3:00 p.m. at a restaurant parking lot located at 2140 E. Plaza Blvd.,
8   National City, California, in order to deliver heroin. When BALLOU arrived at the
9   parking lot, he identified himself and his vehicle and told the agents where it was
10  parked. Agents then detained BALLOU.

11      20.     At the restaurant parking lot, agents searched BALLOU's vehicle, based
12  on probable cause that the vehicle contained contraband, and called BALLOU's phone
13  number to see if they could locate BALLOU's phone, which they found on the driver's
14  side floorboard of the vehicle. Agents also found two loaded and capped syringes
15  (which later tested positive for fentanyl and heroin) under the driver's seat of the
16  vehicle. Agents arrested BALLOU and transported him to the DEA SDFD for
17  processing and interviewing.

18      21.     During a post-arrest interview at the SDFD, BALLOU waived his *Miranda*
19  rights and admitted that he came to the restaurant to sell heroin to GALVAN. BALLOU
20  stated he met GALVAN on October 22, 2018 through a friend and sold GALVAN
21  syringes pre-filled with heroin on October 22, 23, and 24, 2018.[2] BALLOU stated he

22

23  ---
24  [2] Based on my training and experience and my conversations with other agents, I have
    learned that there are many ways that drug users consume heroin. One of the most
25  common methods is by intravenous injection. The process for preparing heroin for
    intravenous injection requires that heroin, which is transported as a semi-solid gum-like
26  substance, be liquefied so that it can be injected into the body through a syringe. Heroin
    is typically liquefied by mixing it with water or some other liquid and warming it over
27  a heat source. Since a typical dose only requires a quantity of heroin measured in
    milliliters, the container or "cooker" used to hold the heroin while it is heating is also
28  small. Aluminum cups that hold tea light candles are often used for this purpose.

8

made the heroin stronger at GALVAN's request the second time he provided her with heroin (on October 23, 2018). BALLOU also told agents that, on October 24, 2018, he learned from GALVAN that she had overdosed the previous day from the heroin he gave her and was taken to the hospital. Nonetheless, BALLOU admitted that the following day (the day GALVAN died), he delivered more heroin to GALVAN in National City, California and meant to bring her Narcan in case she overdosed again, but forgot it at his residence.

22.     When questioned about where he obtained the heroin, BALLOU stated he did not wish to disclose any information regarding his SOS.

23.     BALLOU then signed two consent forms authorizing agents to search his bedroom and his iPhone cell phone (**Target Device 1**).[3] BALLOU confirmed that he resided at 8384 El Paso Street, La Mesa, California. When agents knocked on the door of that residence, Beverly Ballou (B. Ballou), BALLOU's mother, answered the door and told agents that she lived at the residence, and that BALLOU resided there with her. B. Ballou told agents that BALLOU occupied the westernmost bedroom on the south side of the house (BALLOU's bedroom).

---

Because heroin tends to revert back to its solid state over time, the liquefaction process occurs shortly before the heroin will be used.

[3] **Target Device 1** was later downloaded by an agent pursuant to BALLOU's consent. Information regarding that agent is set forth in a Notice Re: Search Warrant Affidavit, filed concurrent with the Application for A Search Warrant for **Target Device 1**. The agent retrieved the phone from an evidence bag, attached it to a computer that was equipped with software to automatically copy and download the cellphone's content, and activated the computer program, which copied the phone's content to a disc. The download was only partially successful. Agents were able to generate reports that contained some content from **Target Device 1**. However, agents were unable to replicate the download on any computer other than the computer used for the original download. Nothing obtained in that first search is being relied on in seeking this warrant. In an abundance of caution, I ask the court not to consider information agents may or may not have seen during that examination in determining whether there is probable cause for the requested warrants in this affidavit. The examination obtained through this warrant will allow a complete download of **Target Device 1** and will also confirm the authenticity of any evidence contained in **Target Device 1**.

24.    During a search of BALLOU's bedroom, agents recovered three additional cellular telephones (**Target Devices 2, 3** and **4**) and numerous items indicative of narcotics dealing. Agents found **Target Device 2** on top of the bed in BALLOU's bedroom. Agents found **Target Device 3** on top of the nightstand at the foot of the bed in BALLOU's bedroom. Agents found **Target Device 4** at the bottom of the nightstand at the foot of the bed.

25.    Agents also found in BALLOU's bedroom:

- A digital scale with residue that later tested positive for heroin, THC, cocaine, morphine and certain other substances, at the bottom of the nightstand at the foot of the bed (the same location where agents found **Target Device 4**).

- A silver colored metal "cooker" containing burn marks and brown residue (which has tested positive for both heroin and fentanyl), on top of the night stand at the foot of the bed (the same location where agents found **Target Device 3**).

- Five more silver-colored metal "cookers" containing burn marks and brown residue that later tested positive for heroin and Fentanyl, on top of the trash can located on the floor at the foot of the bed.

- Three sealed packages of Narcan[4] nasal spray found in an open green shoe box on top of the bed (the same bed where agents found **Target Device 2**).

- A .40 caliber Springfield Armory semi-automatic handgun, with an empty chamber, and a loaded magazine containing ten rounds of ammunition, found under the pillow on top of the bed.

26.    Based upon my experience investigating narcotics traffickers and the particular investigation in this case, there is probable cause to believe that BALLOU used the **Target Devices** to coordinate the distribution of federally controlled

---

[4] Narcan is a heroin antidote that can be used in case of an overdose.

1   substances on or about October 25, 2018. In addition, I believe that recent calls made
2   and received, telephone numbers, contact names, electronic mail (e-mail) addresses,
3   appointment dates, text messages, pictures and other digital information may be stored
4   in the memory of the **Target Devices,** which may identify other persons involved in
5   narcotics trafficking activities. Accordingly, based upon my experience and training,
6   consultation with other law enforcement officers experienced in narcotics trafficking
7   investigations, and all the facts and opinions set forth in this affidavit, I believe that
8   information relevant to BALLOU's narcotics distribution activities, such as telephone
9   numbers, made and received calls, contact names, electronic mail (e-mail) addresses,
10   appointment dates, messages, pictures, and other digital information may be stored in
11   the memory of the **Target Devices**.

12      27.   Finally, I also have learned that narcotics trafficking activities entail
13   advanced planning to successfully acquire a supply chain and establish a distribution
14   network. In my professional training, education and experience, I have learned that this
15   requires planning and coordination in the days, weeks, and often months in advance of
16   any particular distribution event. Given this, I request permission to search the **Target**
17   **Devices** for items listed in Attachment B beginning on July 27, 2018, up to and
18   including October 25, 2018.

19                              **METHODOLOGY**

20      28.   It is not possible to determine, merely by knowing the cellular telephone's
21   make, model and serial number, the nature and types of services to which the device is
22   subscribed and the nature of the data stored on the device. Cellular devices today can
23   be simple cellular telephones and text message devices, can include cameras, can serve
24   as personal digital assistants and have functions such as calendars and full address books
25   and can be mini-computers allowing for electronic mail services, web services and
26   rudimentary word processing. An increasing number of cellular service providers now
27   allow for their subscribers to access their device over the internet and remotely destroy
28   all of the data contained on the device. For that reason, the device may only be powered

in a secure environment or, if possible, started in "flight mode" or "airplane mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard-drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

29. Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target Devices** and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant. Because searching digital devices can be a highly technical process that can require specific expertise and specialized equipment, it may be necessary to consult with specially trained personnel retained by the government to conduct and analyze this forensic extraction.

30. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

1
## CONCLUSION

2    31.    Based on all of the facts and circumstances described above, there is

3 probable cause to conclude that BALLOU used the **Target Devices** to facilitate

4 violations of Title 21, United States Code, Section(s) 841.

5    32.    Because the **Target Devices** were promptly seized during the investigation

6 of BALLOU's distribution activities and have been securely stored, there is probable

7 cause to believe that evidence of illegal activities committed by BALLOU continues to

8 exist on the **Target Devices**. As stated above, I believe that the date range for this search

9 is from July 27, 2018 through October 25, 2018.

10    33.    WHEREFORE, I request that the court issue a warrant authorizing law

11 enforcement agents, other federal and state law enforcement officers, and/or other

12 specially trained personnel retained by the government, to search the items described in

13 Attachments A-1 through A-4, and the seizure of items listed in Attachments B-1

14 through B-4, using the methodology described above.

15    I swear the foregoing is true and correct to the best of my knowledge and belief.

16

17

18    Special Agent Sarah Duray
     DEA Special Agent

19

20 Subscribed and sworn to before me this 16th day of May, 2019.

21

22

23

24 Hon. Michael S. Berg
     United States Magistrate Judge

25

26

27

28

# **ATTACHMENT A-1**
## PROPERTY TO BE SEARCHED

The following property is to be searched:

> A silver Apple iPhone in a clear case with an associated phone number of
> 619-453-2186 and a pass code of "0712"
> (**Target Device 1**)

**Target Device 1** is currently stored at the DEA SDFD located at 4560 Viewridge
Avenue, San Diego, California 92123.

## ATTACHMENT B-1
ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data for the period of July 27, 2018 to October 25, 2018.

a.   tending to identify attempts to possess heroin, Fentanyl, or other federally controlled substances with the intent to distribute them;

b.   tending to identify other accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the possession of heroin, Fentanyl, or other federally controlled substances with the intent to distribute them within the United States;

c.   tending to identify co-conspirators, criminal associates, or others involved in the possession of heroin, Fentanyl, or other federally controlled substances with the intent to distribute them;

d.   tending to identify travel to or presence at locations involved in the possession or distribution of heroin, Fentanyl, or other federally controlled substances, including stash houses, residences used to prepare or process controlled substances, and/or delivery points;

e.   tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of Title 21, United States Code § 841.